UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| POST ACUTE MEDICAL AT HAMMOND, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>ALEX M. AZAR II,<br><br>*Defendant*. | Civil Action No. 16-1257 (DLF) |

# MEMORANDUM OPINION

Post Acute Medical at Hammond, a hospital that qualifies as a provider of services under the Medicare Act, challenges a rule promulgated by the U.S. Health and Human Services (HHS) that reduced Post Acute's reimbursement amount for services provided in 2016. Post Acute claims that the rule violates the Administrative Procedure Act and the Medicare Act because it is arbitrary and capricious and was promulgated with insufficient notice. Before the Court are Post Acute's Motion for Summary Judgment, Dkt. 16, and HHS Secretary Alex M. Azar II's Cross-Motion for Summary Judgment, Dkt. 17.[1] For the reasons that follow, the Court will deny Post Acute's motion and grant the Secretary's motion.

## I. BACKGROUND

Medicare is a federal health insurance program administered by HHS that primarily serves elderly or disabled people. Under the Medicare Act, when a long-term care hospital

---

[1] Sylvia M. Burwell was HHS Secretary when Post Acute filed its complaint, but Alex M. Azar II has since taken that position and is automatically substituted as the defendant in this case under Rule 25(d) of the Federal Rules of Civil Procedure.

discharges a Medicare beneficiary, HHS pays the hospital with predetermined standard rates rather than reimbursing actual costs. *See* Medicare, Medicaid, and SCHIP Balanced Budget Refinement Act, Pub. L. No. 106-113, § 123 (1999) (codified as a note to 42 U.S.C. § 1395ww) (directing the HHS Secretary to "develop a per discharge prospective payment system for payment for inpatient hospital services of long-term care hospitals"). The hospital receives a certain fixed amount per patient no matter what it actually spends on the patient.

In implementing this prospective payment system, HHS calculates a long-term care hospital's reimbursement amount by approximating the costs that a typical, similarly situated hospital would incur. HHS estimates the per patient average cost incurred by hospitals nationwide, then factors in several adjustments. *See generally* 42 C.F.R. §§ 412.513, 412.515, 412.517, 412.523. The most prominent of these adjustments accounts for a patient's diagnosis. *See id.* § 412.515. Another adjustment—central to this case—is a labor-cost adjustment that accounts for the varying wage levels across the country. *Id.* § 412.523(d)(4); *see also* Pub. L. No. 106-113, § 123 (codified as a note to 42 U.S.C. § 1395ww) (requiring the prospective payment system to "include an adequate patient classification system that is based on diagnosis-related groups . . . and that reflects the differences in patient resource use and costs"); Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act, Pub. L. No. 106-554, § 307(b)(1) (2000) (codified as a note to 42 U.S.C. § 1395ww) ("The Secretary shall examine and may provide for appropriate adjustments to the long-term hospital payment system, including adjustments to [diagnosis-related groups] weights [and] area wage adjustments."). A hospital's labor-cost adjustment does not reflect the actual wages it pays; instead the adjustment reflects the average wages paid by hospitals in the area. *See* 42 C.F.R. § 412.523(d)(4); *id.*

§ 412.525(c)(1). If a particular geographic area has high hospital labor costs, a hospital in that area will receive a correspondingly higher Medicare reimbursement.

To determine a hospital's labor-cost adjustment, HHS must assign it to a geographic area. HHS does this by using geographic classifications issued by the Office of Management and Budget (OMB). The OMB defines "Metropolitan Statistical Area" as consisting of an "urbanized area of 50,000 or more population, plus adjacent territory that has a high degree of social and economic integration with the core." Office of Mgmt. & Budget, Bulletin No. 15–01 (July 15, 2015). Meanwhile, the OMB defines a "Micropolitan Statistical Area" identically to Metropolitan Statistical Areas except with a smaller urbanized area: the urbanized area contains at least 10,000 but fewer than 50,000 people. *Id.* HHS defines Metropolitan Statistical Areas as urban areas and all other areas as rural areas. 42 C.F.R. § 412.503. For a hospital located within a Metropolitan Statistical Area, HHS classifies the hospital's labor-market area as that Metropolitan Statistical Area. For a rural hospital, HHS classifies the hospital's labor-market area as the entirety of the rural area of the state. *See* Fiscal Year 2003 Rule, 67 Fed. Reg. 55,954, 56,015–19, 56,057–75 (Aug. 30, 2002). HHS collects wage data from acute care hospitals to determine the labor-cost adjustment for each labor-market area. *See* Fiscal Year 2016 Rule, 80 Fed. Reg. 49,326, 49,797 (Aug. 17, 2015).

This system has been in place for more than a decade. More recently, HHS's only relevant changes have been in response to OMB's reclassification of the country's geographic areas based on the 2010 census. With the new census, certain areas moved between the Metropolitan Statistical Area and rural categories. HHS adopted these reclassifications for fiscal year 2015. *See* Fiscal Year 2015 Rule, 79 Fed. Reg. 49,854, 50,180–85, 50,391–96 (Aug. 22,

3

2014).[2] The Rule challenged here, which concerns fiscal year 2016, carried over the geographic classifications from the 2015 fiscal year (that were based on the 2010 census). *See* 80 Fed. Reg. 49,326.

Post Acute is located in Tangipahoa Parish, Louisiana, and was reclassified from a rural category into the Hammond, Louisiana Metropolitan Statistical Area after the 2010 census. For fiscal year 2014—the last year with the pre-census classifications—the Louisiana statewide rural labor-market area wage index was .7585. Dkt. 17-1. For fiscal year 2015, the Hammond wage index was .9452. Dkt. 17-2. For fiscal year 2016, the Hammond wage index was .8167. Dkt. 17-6. In sum, Post Acute's labor-costs adjustment rose significantly when it transitioned from rural to urban, but dropped from fiscal year 2015 to fiscal year 2016. The labor-cost adjustment for 2016 resulted in a reimbursement approximately $1,046,874 lower than it would have been with the 2015 Hammond wage index (though approximately $983,840 *higher* than it would have been with the 2016 Louisiana rural index). *See* Post Acute Mot. Summ. J. at 19, Dkt. 16; Dkt. 17-7. The fluctuation is explained partly by the fact that the Hammond Metropolitan Statistical Area has only two acute care hospitals from which HHS collects wage data. Dkt. 17-8. The smaller the number of hospitals going into the calculation, the more volatile an area's wage index will be—the shifting wages of a single hospital will have a more noticeable effect.

Post Acute filed this suit in June 2016. It claims that in promulgating the Fiscal Year 2016 Rule, HHS violated the notice-and-comment requirements of the Administrative Procedure

---

[2] Immaterial to this suit, HHS created a one-year transition period in which long-term care hospitals that experienced a decrease in their wage index as a result of being reclassified received a blended wage index for 2015 that averaged the wage index under their new classification with the wage index under their old classification. 79 Fed. Reg. 49,854, 50,180–85, 50,391–96. Post Acute did not receive a blended wage index for 2015 because its reclassification caused its wage index to *increase* in 2015.

Act and the Medicare Act. *See* 5 U.S.C. § 553; 42 U.S.C. § 1395hh(b)(1). Specifically, the complaint alleges that HHS failed to provide adequate notice of the "potential for significant variability in the wage index for hospitals that are located in regions with only a few hospitals" resulting from HHS's "decision to retain for [fiscal year] 2016 the revised labor market delineations that were adopted in the [fiscal year] 2015 final rule." Compl. ¶ 43, Dkt. 1. Post Acute also claims that HHS acted arbitrarily and capriciously (1) by failing to adopt policies to reduce year-to-year wage-index volatility for areas with few hospitals; and (2) by categorizing long-term care hospitals in Micropolitan Statistical Areas as rural (and thus decreasing their year-to-year wage index volatility) while not decreasing the wage-index volatility for hospitals like Post Acute located in Metropolitan Statistical Areas with few hospitals. *Id.* ¶¶ 53, 58. Both Post Acute and the HHS Secretary filed motions for summary judgment. Dkt. 16; Dkt. 17. This case was transferred to the undersigned judge on December 4, 2017.

## II. LEGAL STANDARDS

A court grants summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A "material" fact is one with potential to change the substantive outcome of the litigation. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.

Here the plaintiff seeks review of an agency's final rule, invoking the Administrative Procedure Act's requirement that a court "hold unlawful and set aside" any aspect of the rule that is "arbitrary [and] capricious" or "otherwise not in accordance with law." 5 U.S.C. § 706(2). In

5

an APA case, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006). In other words, "the entire case . . . is a question of law" and the district court "sits as an appellate tribunal." *Am. Biosci., Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (quotation marks and footnote omitted).

In an arbitrary and capricious challenge, the core question is whether the agency's decision was "the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983); *see also Nat'l Telephone Co-op. Ass'n v. FCC*, 563 F.3d 536, 540 ("The APA's arbitrary-and-capricious standard requires that agency rules be reasonable and reasonably explained."). The court's review is "fundamentally deferential—especially with respect to matters relating to an agency's areas of technical expertise," *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) (quotation marks and alteration omitted); the court "is not to substitute its judgment for that of the agency," *State Farm*, 463 U.S. at 43. An agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or [the explanation] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. While an agency "has discretion to design rules that can be broadly applied, sacrificing some measure of fit for administrability," *Leather Indus. of Am. v. EPA*, 40 F.3d 392, 403 (D.C. Cir. 1994) (internal quotation marks omitted), the agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 43 (internal quotation marks omitted). The court will

6

sustain the agency action, however, unless the agency has committed a "clear error in judgment." *Marsh v. Oregon Nat'l Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks omitted). The party challenging an agency's action as arbitrary and capricious bears the burden of proof. *Pierce v. SEC*, 786 F.3d 1027, 1035 (D.C. Cir. 2015).

## III. ANALYSIS

Post Acute challenges the Fiscal Year 2016 Rule on grounds that it was promulgated without sufficient notice and that it is arbitrary and capricious.

### A. Notice

Post Acute argues that HHS fell short of its notice obligations by failing to "adequately notify affected parties of the significance" of carrying over the geographic classifications from fiscal year 2015 into fiscal year 2016. Post Acute Mot. Summ. J. at 26. Post Acute maintains that HHS should have informed it of the potential volatility in its wage index that would result from its classification in an area with the wage data of only two hospitals. *Id.*; *see also* Post Acute Opp'n & Reply at 12, Dkt. 20 ("[T]he APA was designed to protect regulated parties, like Plaintiff, from harm that the agency could have foreseen and should have alerted them to."). Because there was no way of knowing about this volatility in fiscal year 2015, Post Acute continues, it is the Fiscal Year 2016 Rule that is flawed. Post Acute Mot. Summ. J. at 26.

The Administrative Procedure Act, however, does not require an agency to advise regulated entities as to the individualized implications of a proposed rule—particularly here, where the rule merely continued a longstanding policy with updates reflecting new data.[3] Notice

---

[3] The Medicare Act's notice requirements track the APA's notice requirements, and the Court will therefore evaluate Post Acute's notice claims together. *See Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807, 814 (D.C. Cir. 2001) (observing that the Medicare Act "places notice and comment requirements on the Secretary's substantive rulemaking similar to those created by the APA"); 42 U.S.C. § 1395hh(a)(2), (b)(1) (requiring the HHS Secretary, with limited

7

need include only "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b); *see also U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 700 (D.C. Cir. 2016) (stating that the APA requires agencies to "provide sufficient factual detail and rationale for [a proposed] rule to permit interested parties to comment meaningfully" (quotation marks omitted)). Requiring agencies to explain the potential negative consequences of a proposed rule on each regulated entity—to act as devil's advocate at law, in essence—would be extremely burdensome, and the APA does not impose any such requirement. Section 553 requires the agency simply to inform the public of what the rule will look like. It is up to the regulated entities to determine how the proposed rule would affect their welfare and to comment accordingly.

In suggesting that an agency must go far beyond § 553's requirements, Post Acute cites a line from a D.C. Circuit opinion stating that an agency adopting a final rule must "'identify the significance of the crucial facts.'" *Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1132 (D.C. Cir. 1995) (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C. Cir. 1970)). Context makes clear, however, that this requirement pertains to judicial review of the agency's reasoned decisionmaking, not its notice of proposed rulemaking:

> The function of the court is to assure that the agency has given reasoned consideration to all the material facts and issues. This calls for insistence that the agency articulate with reasonable clarity its reasons for decision, and identify the

---

exceptions, to provide notice and comment before issuing a final rule that "establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits"); *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1109 (D.C. Cir. 2014) (discussing differences between the APA and the Medicare Act not relevant here).

significance of the crucial facts, a course that tends to assure that the agency's
policies effectuate general standards, applied without unreasonable discrimination.

*Greater Boston Television*, 44 F.2d at 851 (footnote omitted). This is the most natural reading of the D.C. Circuit's precedent, and it also avoids conflict with § 553(c)'s plain text, which imposes no such requirement on notices of proposed rulemaking.

Moving on to what § 553 does require, the Court concludes that HHS did more than enough to provide notice of the Rule's substance. The proposed rule explained that the "OMB delineations are based on the best available data that reflect the local economies and area wage levels of the hospitals that are currently located in these geographic areas." 80 Fed. Reg. at 24,643. The proposed rule also referred readers to earlier rules that discussed the system's underlying policies and justifications in great detail. *Id.*; *id.* at 24,525. HHS gave notice of the methodology and data used to calculate each hospital's wage index and the wage indexes themselves. *See, e.g.*, *id.* at 24,644; Dkt. 17-5. Because OMB had not "issued any further updates" after issuing the delineations used in the 2015 rule, the proposed rule retained the geographic classifications adopted for 2015. 80 Fed. Reg. at 24,644. The proposed rule thus made no changes relevant to this suit beyond updating the wage indexes based on new data. *See id.* at 24,525–24,554. As HHS points out, the proposed rule gave Post Acute all the information it has now.[4] *See* HHS Mot. Summ. J. at 22, Dkt. 17.

Furthermore, though the proposed rules for both fiscal years 2015 and 2016 made the potential for wage-index volatility in Hammond apparent, HHS explained the concept thoroughly when issuing the 2015 final rule. In an addendum to the 2015 rule, HHS observed that

> [l]abor market areas . . . with fewer providers are generally subject to less stability in year-to-year wage index values because there is less of an averaging effect,

---

[4] The final rule actually assigned Post Acute a higher wage index than did the proposed rule. *See* HHS Mot. Summ. J. at 22, 31, Dkt. 17.

9

wherein even relatively minor changes in one provider's wage data can produce a relatively "significant" effect on the wage index value for that area.

79 Fed. Reg. at 50,395. And HHS cited the 2015 rule in the proposed rule for fiscal year 2016. 80 Fed. Reg. 24,324, 24,643 ("[F]or [fiscal year] 2016, we are proposing to continue to use the . . . labor market area delineations currently used . . . as adopted in the [fiscal year] 2015 . . . final rule."). HHS did, in fact, alert the public to the potential wage-index volatility in places like Hammond even though it was not required to.

Post Acute offers two additional criticisms of HHS's notice, neither of which persuade. First, Post Acute invokes the D.C. Circuit's critical-material doctrine, which states that "[u]nder APA notice and comment requirements, among the information that must be revealed for public evaluation are the technical studies and data upon which the agency relies in its rulemaking." *Banner Health v. Price*, 867 F.3d 1323, 1336 (D.C. Cir. 2017) (internal quotation marks omitted). *But see* 5 U.S.C. § 553(b)(3) (requiring only that notice shall include "either the terms or substance of the proposed rule or a description of the subjects and issues involved"); *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978) ("[S]ection [553] of the Act established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures."); *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (observing a "tension between *Vermont Yankee* and our critical material doctrine"); *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 246 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) (writing that the D.C. Circuit's critical-material doctrine "cannot be squared with the text of § 553 of the APA" and that "the Supreme Court . . . rejected this kind of freeform interpretation of the APA . . . [in] its landmark *Vermont Yankee* decision"). The critical-material doctrine

does not apply here because Post Acute cannot point to any record evidence—or anything omitted from the record—suggesting that HHS failed to disclose any critical and relied-upon material. *See Banner Health*, 867 F.3d at 1337 (rejecting a critical-material claim because the agency had not "relied on" the undisclosed information); *Am. Radio Relay League*, 524 F.3d at 240 (majority opinion) (implying that the critical-material doctrine is "limited to *studies on which the agency actually relies* to support its final rule" (internal quotation marks omitted)).

Second, Post Acute invokes the logical-outgrowth doctrine: an agency "may promulgate a rule that differs from a proposed rule only if the final rule is a logical outgrowth of the proposed rule"—*i.e.*, if "affected parties should have anticipated that the relevant modification was possible." *Allina Health*, 746 F.3d 1102, 1107 (D.C. Cir. 2014) (internal quotation marks omitted); *see also* 42 U.S.C. § 1395hh(a)(4) ("If the Secretary publishes a final regulation that includes a provision that is not a logical outgrowth of a previously published notice of proposed rulemaking or interim final rule, such provision shall be treated as a proposed regulation and shall not take effect until there is the further opportunity for public comment and a publication of the provision again as a final regulation."). The logical-outgrowth doctrine does not apply here because the proposed rule and final Rule are materially identical. *Compare* 80 Fed. Reg. at 24,643, *with* 80 Fed. Reg. at 49,797.

### B. Arbitrary and Capricious Review

"It is black-letter administrative law that absent special circumstances, a party must initially present its comments to the agency during the rulemaking in order for the court to consider the issue." *Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C.

Cir. 2001) (internal quotation marks and alteration omitted).  That is reason enough to reject Post Acute's arbitrary and capricious claims:  Post Acute failed to raise any objection to its wage index during the rulemaking process despite publication of its lowered wage index.

The claims fail on their merits regardless.  First, Post Acute claims that HHS acted arbitrary and capriciously by failing to adopt a policy to reduce year-to-year wage-index volatility for areas with few hospitals.  Notably, Post Acute does not challenge "the wage index regulations," "the most current [labor-market areas] as a basis for determining [a long-term care hospital's] wage index," "the accuracy of the specific wage data used to calculate its wage index," or "the accuracy of [HHS] calculations under the existing methodology that determined [Post Acute's] assigned wage index amount."  Post Acute Opp'n & Reply at 7.  The challenge is aimed solely at the absence of a carve-out to reduce wage-index volatility for hospitals in areas with few acute-care hospitals.

The D.C. Circuit has already ruled that HHS's delineation of labor-market areas is reasonable.  In *Southeast Alabama Medical Center v. Sebelius*, the Court observed that the Medicare Act "provides only that the [wage index] should 'reflect[] the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level."  572 F.3d 912, 923 (D.C. Cir. 2009) (quoting 42 U.S.C. § 1395ww(d)(3)(E)).  Noting that the term "geographic area" is ambiguous and could refer to an area "as small as a city block," the Court concluded that "HHS's longstanding policy of using Metropolitan Statistical Areas . . . to define those 'geographic areas' is a reasonable response to this ambiguity."  *Id.* (internal quotation marks omitted).  A geographic area as small as a city block would presumably contain no more than a single

hospital and would therefore cause far more wage-index violatility than even exists in Hammond.

HHS gave more than enough reasoning, moreover, for its decision to maintain its longstanding wage-index system—which has never included a special exception for hospitals like Post Acute—for fiscal year 2016. HHS explained that the use of OMB geographic classifications ensures that its wage-index system "most appropriately accounts for and reflects the relative hospital wage levels in the geographic area of the hospital as compared to the national average hospital wage level based on the best available data that reflect the local economies and area wage levels of the hospitals that are currently located in these geographic areas." 80 Fed. Reg. at 24,643. HHS also referred readers to previous iterations of the rule, in which it explained that Metropolitan Statistical Areas are a reasonable metric for defining labor-market areas "because they are based upon characteristics [HHS] believes also generally reflect the characteristics of unified labor market areas." 70 Fed. Reg. at 24,184. For example, Metropolitan Statistical Areas "reflect a core population plus an adjacent territory that reflects a high degree of social and economic integration." *Id.* And after observing that "[l]abor market areas . . . with fewer providers are generally subject to less stability in year-to-year wage index values because there is less of an averaging effect," HHS determined that this volatility was acceptable given that even volatile wage indexes would be calculated from "the most recent data available that reflect the relative hospital wage level in a geographic area." 79 Fed. Reg. at 50,394–95. This decision not to "complicate matters by layering in" an exception for areas with few hospitals, *Southeast Alabama Med. Ctr.*, 572 F.3d at 923, was not arbitrary and capricious. "Whether or not it would have been desirable for

[HHS] to adjust the [Hammond wage index] on the basis of [its low number of hospitals], it was reasonable for it to decline to do so." *Id.*

Second, Post Acute argues that HHS acted arbitrarily and capriciously by treating it differently than similarly situated hospitals. *See Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 216 (D.C. Cir. 2013) ("Agency action is arbitrary and capricious if the agency offers insufficient reasons for treating similar situations differently." (internal quotation marks omitted)). Specifically, Post Acute points out that HHS treats hospitals located in Micropolitan Statistical Areas—which contain smaller urban clusters than those of Metropolitan Statistical Areas but are otherwise identical—as rural. Hospitals like Post Acute that are located in Metropolitan Statistical Areas with few hospitals, however, are treated as urban.

As with the others, this claim fails for an abundance of reasons. Foremost is the fact that the different treatment Post Acute complains of was not created by the Fiscal Year 2016 Rule. The claim's object is unclear, moreover, because Post Acute does not *want* to be treated like hospitals in Micropolitan Statistical Areas—the statewide rural wage index is lower than that of the Hammond Metropolitan Statistical Area.

In any event, HHS has not treated like situations differently: Hospitals in Metropolitan Statistical Areas and hospitals in Micropolitan Statistical Areas are not alike. The former includes an urban cluster of at least fifty thousand people, while the latter might have an urban cluster of only ten thousand people. Post Acute seizes on concerns noted in the rule for fiscal year 2015 that because Micropolitan Statistical Areas generally contain fewer hospitals than Metropolitan Statistical Areas, treating them as urban could cause "drastically more single-provider labor market areas," "create

instability in year-to-year wage index values for a large number of hospitals," and "create an inequitable system when so many hospitals would have wage indexes based solely on their own wage data, while other hospitals' wage indexes would be based on an average hourly wage across many hospitals." 79 Fed. Reg. at 50,182. Post Acute argues that HHS should have addressed these concerns with respect to Metropolitan Statistical Areas like Hammond as well. But the likelihood of an area having only one or two hospitals is much greater when it contains only ten thousand people than when it contains fifty thousand people. *See* HHS Mot. Summ. J. at 33–34. HHS's decision to draw a line between Metropolitan Statistical Areas and Micropolitan Statistical Areas was reasonable.

## CONCLUSION

For the foregoing reasons, the Court denies Post Acute's Motion for Summary Judgment, Dkt. 16, and grants the HHS Secretary's Cross-Motion for Summary Judgment, Dkt. 17. A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

Date: May 22, 2018